**SCREEN ADVERTISING FILM FUND CORP.**

v.

**BUENA VISTA DISTRIBUTION CO., INC., et al.**

No. C80–445A.

United States District Court, N.D. Georgia, Atlanta Division.

Aug. 16, 1983.

Lawrence L. Aiken, Riverdale, Ga., for plaintiff.

William N. Withrow, Jr., Tench C. Coxe, J. Kirk Quillian, Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., for defendants Columbia Pictures Industries, Inc., Metro-Goldwyn Mayer, Inc., Paramount Pictures Corp., Twentieth Century Fox Film Corporation, United Artists Corp., Universal Film Exchanges, Inc. and Warner Brothers Distributing Corp.

Joseph B. Haynes, King & Spalding, Atlanta, Ga., and A. Vernon Carnahan, Donovan, Leisure, Newton & Irvine, New York City, for defendant Buena Vista Distribution Co., Inc.

## ORDER OF COURT

MOYE, Chief Judge.

The above-styled action is based upon alleged violations by the defendants[1] of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, under the provisions found in section 4 of the Clayton Act, 15 U.S.C. § 15. Currently before the Court are the defendants' motions for summary judgment.

### Factual Background

Plaintiff Screen Advertising Film Fund Corporation [SAFFCO] was incorporated on June 14, 1977, with a total capital of $500. It was founded by James Patterson who became the president and sole stockholder. SAFFCO intended to enter the business of financing and producing motion pictures. SAFFCO wanted to finance these movies through a complex plan that linked SAFFCO's success with the success of another company—Cinemavision. Cinemavision was incorporated in December 1976 in Tennessee. It attempted to set up a system through which national advertisers could buy time in movie theatres to advertise their products. Cinemavision would act as a middleman between the advertisers and the individual movie theatres. Cinemavision began operations in January 1977 with five salaried employees. Its president, William Woosley, owned 10 percent of the stock and Sam Lovvllo owned the other 90 percent.

On April 22, 1977, Patterson made initial contact with Woosley. Patterson was president of NITE, a national association of theatres with about 5,000 members. Patterson's idea was to set up a corporation that would use the movie theatre's share of screen advertising revenues to finance the production and distribution of motion pictures. Cinemavision would pay the movie theatre's revenues directly to this fund rather than to each theatre. After a series of meetings and negotiations, NITE and Patterson entered into a written agreement with Cinemavision on June 6, 1977. In the agreement, Patterson agreed to try and persuade theatre owners to participate in Cinemavision's screen advertising program. Cinemavision agreed to advance NITE money through which Patterson would be compensated for his efforts.[2]

On June 6, 1977, NITE and Cinemavision also entered into a contract called the "Master Theatre Screening Agreement." This agreement set forth the rates that were to be paid by Cinemavision to theatres for running the advertisements and provided that the theatres could direct Cinemavision to pay such fees directly into the NITE film

---

1. The defendants are Columbia Pictures Industries, Inc.; Metro-Goldwyn Mayer, Inc.,; Paramount Pictures Corporation; Twentieth Century Fox Film Corporation; United Artists Corporation; Universal Film Exchanges, Inc.; Warner Brothers' Distributing Corp.; and Buena Vista Distribution Company, Inc. Although Buena Vista filed a separate motion for summary judgment, because of the similarity of facts and issues, the two motions will be treated together in this order.

2. The agreement provided that Patterson was an employer of NITE and that he would have no claim for compensation against Cinemavision.

fund. The agreement contemplated that this film fund would eventually be incorporated as a legal entity.

The Master Agreement also provided that theatre owners could become parties to the agreement by signing a "binder agreement." The theatre owner could terminate this "binder agreement" after one year by giving the proper notice. The owner was free at any time to terminate the payments to the film fund and receive the advertising revenues directly.

On June 14, 1977, plaintiff SAFFCO was incorporated and became the "legal entity" that took the place of the NITE Film Fund. On August 9, 1977, SAFFCO entered into a "SAFFCO Participation Agreement" with Cinemavision, agreeing to be bound by the terms of the Master Theatre Screening Agreement and assuming all the obligations of the NITE Film Fund under the Master Agreement.

The responsibilities of each of the entities discussed above can be summed up as follows: Cinemavision would convince national advertisers to buy time in movie theatres to advertise their products; Patterson would try to convince the NITE movie theatres to run these advertisements and give the revenues to SAFFCO; and SAFFCO would take these revenues and produce and distribute motion pictures.

By November 1977, Cinemavision had contracts with approximately 5,000 movie theatres. It is disputed how many of these theatres designated their revenues to be turned over to SAFFCO.[3] On September 28, 1977, Cinemavision announced that a test run on 1,000 theatres would commence on October 24, 1977. This test run never occurred because Cinemavision failed to recruit any advertisers. In November 1977, Cinemavision started firing employees, and in December, all payments to NITE and Patterson were stopped. By December, the idea of funding SAFFCO through advertisement revenues was abandoned.[4] Neither Cinemavision nor SAFFCO ever signed any contracts with advertisers and no revenues were ever received by either corporation. What caused the failure of the Cinemavision/SAFFCO enterprise is the primary issue of this litigation.

### SAFFCO's ALLEGATIONS

SAFFCO contends that the defendants acted in concert to refuse to license first run films to any movie theatres participating in the screen advertising program. SAFFCO alleges that the defendants used various other techniques, including economic harassment, to persuade the theatres against participating in the advertising plan. SAFFCO also contends that the defendants engaged in "threatening, harassing, and intimidating" behavior in an attempt to discourage advertisers from entering into contracts with Cinemavision. Plaintiff's Brief at 3. As a result of these activities, SAFFCO alleges that the defendants violated sections 1 and 2 of the Sherman Act.[5]

### Motion for Summary Judgment

■ This Court is fully cognizant that the granting of summary judgment is drastic relief that must be applied sparingly and with caution. *Solomon v. Houston Corru-*

---

**3.** The defendants claim that no more than 100 theatres ever agreed to give their revenues to SAFFCO, whereas SAFFCO argues the number was much higher. In any event, no advertisers ever signed with Cinemavision so none of the theatres ever ran any advertisements.

**4.** Cinemavision ceased operations in June 1978.

**5.** The portions of sections 1 and 2 of the Sherman Act relied upon by SAFFCO reads as follows:

§ 1 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the sev-

eral States, or with Foreign nations is declared to be illegal....

§ 2 Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or both said punishments, in the discretion of the court.

*gated Box Co., Inc.,* 526 F.2d 389, 393 (5th Cir.1976). The pleadings of the opposing party must be liberally construed in order to determine if there are any genuine issues of material fact. *Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107, 1110–12 (5th Cir.1979). Summary judgment is generally not favored in antitrust actions. *See, e.g., Clark v. United Bank,* 480 F.2d 235, 240 (10th Cir.), *cert. denied,* 414 U.S. 1004, 94 S.Ct. 360, 38 L.Ed.2d 240 (1973). Nevertheless, summary judgment is appropriate when "it is plain that the allegedly unlawful practice does not exist, and that plaintiff's claim is without merit." *Solomon, supra,* at 393. The mere allegations of the Sherman Act claim requirements of a contract, combination or conspiracy for the purpose of restraining trade with resulting damages are not by themselves sufficient to withstand a motion for summary judgment. *Id. See also, Murdock v. City of Jacksonville,* 361 F.Supp. 1083, 1086–87 (M.D.Fla.1973) ("Even in an antitrust case a party cannot rest on the allegations contained in his complaint but must . . . come forward with affidavits setting forth specific facts showing that there is a genuine issue of material fact.") When the defendants have presented substantial evidence concerning business dealings and judgment in rebuttal of plaintiff's allegations, it is up to the plaintiff to produce evidence demonstrating that a genuine issue of fact exists. If plaintiff fails to do this, the grant of summary judgment is proper. *Aviation Specialties, Inc. v. United Technologies Corp.,* 568 F.2d 1186, 1192 (5th Cir.1978).

### Discussion

SAFFCO argues that the following incidents give rise to material issues of fact that should preclude summary judgment:

(1) Executives from the defendants were quoted in various articles in Variety during the fall of 1977 as being opposed to screen advertising.[6]

(2) The defendants had never taken a public stance with regard to screen advertising prior to the fall of 1977.

(3) On October 27, 1977, a meeting of the Advertising-Publicity Committee of the Motion Picture Association of America [MPAA] took place in Miami Beach, Florida. All of the distributor defendants belong to this organization.[7] The Committee voted to take a stand against NITE's screen advertising program and to try to convince theatre owners to reject such advertisements.

(4) Defendant Fox adopted a policy where it would charge movie theatres a percentage of the advertising revenue if the theatre wanted to show Fox Films. Fox also required theatre owners to notify Fox if they were going to run advertisements in their theatres.

(5) On November 22, 1977, defendant Warner Brothers mailed out bid solicitations for its film "Superman." Included in the solicitations was a clause prohibiting the exhibition of screen advertisements with the film.

Although it is highly questionable that all of the above allegations could be proven by SAFFCO, especially in light of the abundance of hearsay testimony that SAFFCO relies on, even if the allegations are taken as correct, no issue of material fact exists in this case.

### Causation

Section 4 of the Clayton Act requires that plaintiff demonstrate that its injury was caused by the antitrust actions of the defendant. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 126, 89 S.Ct. 1562, 1578, 23 L.Ed.2d 129 (1969). The injury claimed by SAFFCO is its failure to receive any revenues from the movie theatres that had contracted with Cinemavision to exhibit the advertisements. Thus,

---

**6.** Both parties contest how the interviews came about and what interpretations should be given to the statements made by the various defendants' executives. This issue, however, is not important because it does not address the issue

of causation that this Court finds determinative.

**7.** All of the defendants except Buena Vista.

SAFFCO's injury was inextricably tied to Cinemavision's success in recruiting national advertisers. Regardless of how many theatres actually agreed to show these advertisements, because no advertisers were signed by Cinemavision, SAFFCO received no money.[8] Thus, SAFFCO must attempt to establish that the defendants were responsible for Cinemavision's failure to recruit national advertisers.

SAFFCO alleges absolutely no facts to meet this causation requirement. All of SAFFCO's allegations concern the effect the defendants had on the willingness of theatre owners to agree to run the advertisements. Even assuming the truth of these allegations, there is not a scintilla of evidence to suggest that Cinemavision's failure to recruit advertisers was caused by any acts of the defendants.

SAFFCO contends that Cinemavision was on the verge of signing contracts with RCA Records, Revlon, and Chrysler but that these contracts were abandoned at the last minute due to the acts of the defendants.[9] SAFFCO presents absolutely no evidence to indicate what these acts were. In fact, the evidence indicates that none of the representatives at any of these companies were ever contacted by the defendants with regard to screen advertising, Cinemavision, SAFFCO, NITE, or any proposed plan to produce and distribute motion pictures through the use of screen advertising revenues. See Galante Dep. at 13–14; Spokes Dep. at 18–19; Bell Aff. at ¶ 22. In addition, none of the advertisers had knowledge of any of the statements made by the defendants' representatives in Variety. Bell Aff. at 21; Galante Dep. at 12–13; Spokes Dep. at 17–18.

Many courts have granted summary judgment motions on the grounds that the plaintiff failed to raise any issues of material fact regarding this causation requirement. *E.g., Blank v. Preventive Health Programs,* 504 F.Supp. 416, 420 (C.D.Ga. 1980). *John Lenore & Comp. v. Olympia Brewing Company,* 550 F.2d 495 (9th Cir. 1977). In the *Lenore* case, the plaintiff beer distributor brought an antitrust action against a manufacturer supplier who had terminated the distributorship agreement in favor of the defendant's own distributors. The plaintiff contended that a recent acquisition of the defendants caused the plaintiff's injury. The court of appeals affirmed the district court's granting of summary judgment saying that—

> While we do concede that Lenore has suffered an injury to his property and business interest . . . [w]e agree with the district court's findings that the termination of the distributorships were not directly and proximately caused by the

8. On June 29, 1981, this Court explained SAFF-CO's claim as follows:

> The gravaman of Plaintiff's claim is that SAFFCO never received any funds which were to be donated by certain exhibitors from revenues they were to receive from Cinemavision. . . . Plaintiffs blame defendants for the failure of Cinemavision's on-screen advertising program, and hence the failure of any funds to be donated to SAFFCO.

Order at p. 3

The following flow chart illustrates the interaction between the parties:

SAFFCO's failure was caused by step (1) in this chain. Therefore SAFFCO must present some evidence to indicate that the defendants were in some way responsible for that failure.

9. See note 9 on page 19.

challenged acquisition.... Therefore, while Lenore has proved an injury, he has not shown that he has suffered an ... antitrust injury.... We find there is just no direct relationship between the acquisition and the injury. *Lenore* at 499–500.

Similarly, SAFFCO fails to present any evidence that indicates a connection between its injury and any act of the defendants. The mere allegation that the defendants threatened and harassed advertisers, without any evidence, does not raise a genuine issue of fact. In addition, there is substantial evidence to show that these advertisers were quite suspect of screen advertising for a number of legitimate business reasons.[10]

SAFFCO has failed to show that reasonable inferences can be drawn from the evidence presented that the defendants were at all responsible for SAFFCO's injuries. Absent such reasonable inferences, summary judgment is proper. *See Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107, 1117 (5th Cir.1979). Thus, because of SAFFCO's failure to raise any issue of material fact as to the effect of the defendants' actions on SAFFCO's failure as a business enterprise,[11] defendants' motion for summary judgment is hereby GRANTED.

---

**9.** There is much debate as to how close Cinemavision was to signing these companies. It is clear, however, that none of these companies ever signed a completed contract with Cinemavision.

**10.** Among other concerns, the advertisers were worried that theatre customers would react negatively to their ads and that Cinemavision's fees were too high.

**11.** Because SAFFCO does not have standing because of its failure to meet the causation requirement, this issue is determinative, and thus there is no need to address SAFFCO's other contentions.