In re ALEXANDER DISPOS–HAUL
SYSTEMS, INC., an Oregon
corporation, Debtor.

HOWCO LEASING CORPORATION, an Oregon corporation and Howard-Cooper Corporation, an Oregon corporation, Plaintiffs,

v.

ALEXANDER DISPOS–HAUL SYSTEMS, INC., an Oregon corporation, and Robert Morrow, Trustee, Defendants,

and

Aid Disposal and Recycling Services, Inc.; One-Way Disposal Service, Inc.; and Plew's Drop Box Service, Inc., Oregon corporations, Intervenors.

Bankruptcy No. 382–02636.
Adv. No. 83–0205.

United States Bankruptcy Court,
D. Oregon.

Dec. 30, 1983.

John M. Berman, Portland, Or., for plaintiffs.

Kevin D. Padrick, Portland, Or., for trustee.

Ronald A. Watson, Portland, Or., for Plews.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ALLOWING FORECLOSURE BY PLAINTIFFS

DONAL D. SULLIVAN, Bankruptcy Judge.

Howco Leasing Corporation ("Howco") filed a complaint to permit foreclosure of its security interest under 11 U.S.C. § 362 against most of the remaining assets of the debtor, Alexander's Dispos-Haul Systems, Inc., ("ADS"). The trustee for ADS counterclaimed, seeking a judgment avoiding the security interest of Howco as fraudulent under 11 U.S.C. § 548. The issues arose primarily from guarantees given by the debtor in connection with the sale of the

assets of a refuse business by the Plew family ("Plews") to Harold Alexander, who was the chief officer and co-owner with his wife, of the debtor. AID Disposal and Recycling Services, Inc., One-Way Disposal Service, Inc., and Plew's Drop Box Service, Inc. were corporations controlled by the Plew family which sold their assets to Harold Alexander and which by agreement intervened in this case to protect certain drop boxes and containers in possession of the debtor. Howard-Cooper Corporation ("HCC") holds a security interest in some of the assets involved in the Plews' sale and joined the litigation as a co-plaintiff with Howco ("plaintiffs"). According to plaintiffs, the debtor owes a combined balance of over $615,000.00 secured by the property sought. The Court tried the issues pursuant to an agreed pretrial order.

On December 23, 1981, the three Plews' companies sold their assets to Harold Alexander for $755,106.17; $350,000.00 as down payment and the balance, less adjustments, payable in annual installments of at least $100,000.00 commencing on March 15, 1983 until paid. The buyer also assumed the seller's obligations owing to plaintiffs on equipment obligations. Mr. Alexander paid $200,000.00 cash at the time of closing and promised to pay the $150,000.00 balance of the down payment in about three months. The intangible assets sold consisted primarily of customer lists. A significant portion of the tangible assets sold were various drop boxes, containers and trucks, which were subject to five agreements held by the plaintiffs consisting of two equipment leases and three installment purchase contracts. At the time of the Plews' sale, these agreements secured an aggregate balance of $834,793.61 payable at $23,782.00 per month. The Plews consented in the sale contract to a further transfer of the assets to the debtor by Alexander. At the same time, plaintiffs also consented in separate agreements to the sale of their collateral to Mr. Alexander and made certain modifications to the leases. In return, plaintiffs received $83,795.00 of the initial down payment, most of which was applied to Plews' delinquencies on one of the leases. Alexan-

der also agreed to pay to plaintiffs the unmatured balance of the down payment for application mostly to the other lease and a contract. If the down payment is allocated to reduce the balance owed to plaintiffs, the resulting effective price for the business appears to be approximately $1,304,104.00 less adjustments claimed in the estimated amount of $55,000.00.

As additional consideration for plaintiffs' consent, Harold Alexander, acting on his own behalf, assumed the Plews' obligation to plaintiffs and on behalf of ADS, jointly and severally guarantied performance. Mrs. Alexander also added her guarantee, limited to $100,000.00. The Alexanders and ADS secured their guarantees by a pledge of real estate and personal property which, in addition to separately-owned assets, apparently included all of the assets of ADS. Almost as an afterthought, Harold Alexander added, as a postscript to the Plews' sale contract, ADS's handwritten guarantee and also promised to pledge to the seller all of ADS's assets as security for the guarantee. Howco within a few days perfected its security interest against all guarantors by obtaining separate and all-encompassing security agreements covering all tangible and intangible assets and by filing appropriate financing statements. The Plews' efforts at perfection appear to be limited to the filing of financing statements against Harold Alexander with respect to certain scheduled equipment which was also included in plaintiffs' broader security agreements.

Harold Alexander, also on December 23, 1981, signed documents leasing the physical assets acquired from the Plews to ADS in return for 34 monthly payments of $44,-400.00 which Harold Alexander explained would have covered somewhat more than his remaining liability on the Plews' sale contracts. Mr. Alexander testified that, although ADS made a few payments, he defaulted on the assumed equipment obligations held by plaintiffs within one or two months thereafter. He did not pay the $150,000.00 balance of the down payment which was due in March of 1982. One of

the Plew brothers testified that the Plews' share of the initial down payment was used mostly to pay the general presale debts of their business.

ADS filed for reorganization under Chapter 11 of the Bankruptcy Code on August 20, 1982. After an unsuccessful and stormy effort at reorganization, and the appointment of an examiner, the debtor voluntarily converted the case to a liquidation proceeding under Chapter 7 of the Bankruptcy Code on February 25, 1983. During the period of Chapter 11 operation, the Court approved a cash collateral stipulation entered under 11 U.S.C. § 363(c)(2)(A) continuing plaintiffs' security interest in assets generated during the Chapter 11 to protect plaintiffs against loss arising from the debtor's collection and use of cash proceeds of its collateral. The trustee turned over to secured creditors most of the assets, including those assets subject to plaintiffs' five equipment agreements. The trustee did not turn over certain former assets of the Plews' companies and those assets of ADS which became subject to a security agreement running in favor of the plaintiffs at the time of the Plews' sale. At the commencement of the present litigation, the trustee, among other assets, held approximately $200,000.00 claimed by plaintiffs. Of this sum $80,762.53 is attributable to the sale of the customer lists and general intangibles of the debtor and the balance resulted from the collection of accounts receivable.

The trustee asserts that the debtor's obligations and pledge of assets to the plaintiffs were fraudulent because ADS received less than "reasonably equivalent value in exchange" within 11 U.S.C. § 548(a)(2)(A) and because ADS before, during and after the transaction was insolvent or became insolvent because of the transaction.

The ultimate issue is whether the debtor's December 23, 1981 guarantee of the five Plews' obligations to plaintiffs and pledge of its assets as security to plaintiffs are fraudulent under 11 U.S.C. § 548 for any reason and, if not, whether the security interest claimed by the Plews is, in any event, avoidable under 11 U.S.C. § 544(a) because of failure to perfect against the debtor. If the guarantee and pledge to plaintiffs are fraudulent under § 548(a), there is the further issue of whether plaintiffs can, nevertheless, retain a lien as a good faith transferee or obligee under 11 U.S.C. § 548(c) because plaintiffs gave sufficient value as measured on December 23, 1981.

I find that the debtor was either insolvent or rendered insolvent as a result of its guarantee of Harold Alexander's obligation to Plews, but that the debtor's guarantee of the five equipment obligations to plaintiffs was not made or accepted with actual intent to defraud creditors and was not fraudulent because the debtor received reasonably equivalent value in exchange.

In addition, I find that the Plews failed to perfect their security interests in those tangible and intangible assets which were not described in the financing statements which were filed against Harold Alexander as the debtor. Their interest is subordinate to plaintiffs' security interest which plaintiffs perfected both against Harold Alexander and against the debtor.

I specifically find that the debtor was a surety for the payment of the obligation to Howco and that Harold Alexander as buyer and the Plews as seller were principals to that obligation. As surety, the debtor received equitable rights against Harold Alexander and the Plews as principals in return for its guarantee of plaintiffs' debts. These rights, combined with the other property received by the debtor, provide more than enough value to support the guarantee to Howco.

Nonbankruptcy law governing the adequacy of consideration and the availability of other defenses to a surety's rights is modified by 11 U.S.C. § 548 when the surety's trustee in bankruptcy asserts rights under 11 U.S.C. § 541(a)(3). A creditor cannot enforce a guarantee against a surety's trustee in bankruptcy if the guarantee was actually fraudulent or if the surety, while insolvent, failed to receive "reasonably equivalent value in exchange" for his

guarantee. 11 U.S.C. § 548(a)(1) and (2). The value received by the guarantor may come indirectly through a third party and if this value prevents the guarantee from depleting the estate, the guarantee cannot be avoided under 11 U.S.C. § 548(a)(2) *Rubin v. Manufacturer's Hanover Trust Co.,* 661 F.2d 979, 991–92 (2d Cir.1981). There is nothing in 11 U.S.C. § 548(a)(2)(A) which requires the value received by a bankrupt guarantor to flow from the beneficiary of the guarantee rather than the other parties to the transaction. The origin of any consideration received in exchange for a guarantee or a transfer only becomes important for purposes of 11 U.S.C. § 548(c) where the creditor claims a lien on the subject matter of transfer after voidability has been found.

 Equity gives a surety the benefit of three doctrines. The first doctrine is the right of exoneration which entitles a surety to compel the principal debtor to pay the primary debt to the creditor. *J. Arant, Handbook of the Law of Suretyship and Guarantee,* § 72 at 318, (1931); *Austad v. U.S.,* 386 F.2d 147, 151 n. 1 (9th Cir.1967). The second doctrine is the surety's right of indemnity which entitles him to compel the principal debtor to repay immediately all or any part of the principal debt which the surety has paid. *Arant, supra,* § 73 at 322; *U.S. v. Frisk,* 675 F.2d 1079, 1082, nn. 6, 7 (9th Cir.1982). The third doctrine is the surety's right of subrogation which entitles him to use any remedy against the principal which the creditor could use and to enjoy any security or any other advantage which the principal creditor has. This right only arises when the surety pays the principal debt in full. *Arant, supra,* § 79 at 357.

 The debtor's right of exoneration and right of indemnity against the principals had value while the debtor's right of subrogation probably had no value because of the debtor's insolvency and inability to ever acquire a right of subrogation by paying off plaintiffs in full. The value of ADS's potential rights of exoneration and indemnity depend upon the financial ability of Harold Alexander and the Plews on De-

cember 23, 1981 when the debtor acquired the rights. The trustee had the burden under 11 U.S.C. § 548(a)(2)(A) of showing that the principals could not pay their potential obligations to the debtor as surety or were insolvent. The trustee failed in this burden. The financial statements which were prepared by the Alexanders in connection with the Plews' sale and personal loan applications establish sufficient net worth at the time of the sale to finance any then-reasonably foreseeable deficiency resulting from the sale, even allowing for the joint character of the personal financial statements. The trustee failed to prove satisfactorily the other adjustments urged. With respect to the Plews' financial condition, the trustee produced only negative innuendo. There is no evidence that anyone planned to become insolvent later.

The equipment lease between Harold Alexander and the debtor, and the guarantee given by the debtor to the Plews for the balance of the purchase price, introduced confusion because Harold Alexander's retention of outright ownership or ownership for security purposes of the physical assets caused these obligations to grossly exceed the value of the remaining property received by the debtor. The debtor can eliminate the confusion by defeating under 11 U.S.C. § 548(a)(2)(A) or 11 U.S.C. § 544(b) and Oregon law, any claim that either the Plews or Harold Alexander might have to the extent that the claim exceeds value advanced by these persons in good faith. The debtor also, in fact, will never pay these obligations. Under the circumstances, it would be inappropriate to factor such illusory offsets into the "reasonably equivalent value" portion of the formula in 11 U.S.C. § 548(a)(2)(A), to reduce either the value of the physical assets or the debtor's rights as surety against the principals.

 Harold Alexander gave the ownership of the Plews' customer list to the debtor. The value of the customer list, when combined with the use by the debtor, of Plews' equipment and plaintiffs' equipment for 14 months, is alone sufficient equivalent value to support the guarantee to plaintiffs.

Harold Alexander purchased the Plews' business in order to acquire the list for the debtor because he thought that the merger of these customers into his existing operation would produce larger gross receipts which ultimately would make his business profitable. On a going concern basis and absent distress circumstances, Alexander testified that the list was so important that there is a custom of valuing a refuse business in multiples of 10 to 20 times the monthly gross receipts, depending upon geography and the ability of the purchaser to serve the customers without substantial added expense. Harold Alexander testified that the gross receipts were about $100,-000.00 per month although he thought they had been represented to be $140,000.00 per month. Acquisition of the sellers' physical equipment was secondary and not necessarily the most desired part of the package.

Without attempting to reconcile the spoken and unspoken assumptions in respect to valuations, Harold Alexander's testimony supports a finding that the customer list was worth more than the value assigned by the trustee or by John Lorenz who, on behalf of his company, was interested in purchasing Plews' business and who ultimately purchased most of the assets from the trustee for a great deal less. Discounting insider influence, the leases and testimony support a finding that the value of the use of Plews' equipment and the equipment subject to plaintiffs' five contracts for the period involved more than fills out any remaining gap necessary to support the guarantee.

All parties participated in the December 23, 1981 transaction in good faith, even though everyone misjudged Harold Alexander's ability to merge two unprofitable businesses into a single profitable business. Evidence of good faith is provided by Harold Alexander's pledge of personal assets and investment of at least $200,000.00 down payment to finance the purchase, and the Plews' application of the $200,000.00 down payment to the presale debts of the business they were selling. These persons, as well as plaintiffs, gambled on the future potential of the business to pay their agreements, although plaintiffs probably benefitted the most from the sale because of application of the down payment and the additional security provided by a pledge of Alexander's personal assets and the debtor's old assets. Nobody expected failure to follow the December 23, 1981 sale, although they should have foreseen the need for future working capital.

■ There was reasonably equivalent value to support the debtor's guarantee and pledge of security for the obligations owing to plaintiffs although, depending upon whether Harold Alexander kept full ownership of the physical assets, there may not have been reasonably equivalent value to support fully the debtor's guarantee of the sale contract to Plews or the lease between the debtor and Harold Alexander. In the absence of actual fraudulent intent, these latter inadequacies may be considered in determining the debtor's insolvency but should not be considered for purposes of diminishing the value supporting plaintiffs' participation.

■ I also find that there was sufficient identity of interest between Harold Alexander and ADS to regard the entire consideration given by the Plews to Harold Alexander as "reasonably equivalent value given in exchange" for ADS's guarantees to plaintiffs under applicable decisions. *Rubin v. Manufacturer's Hanover Trust Co., supra,* 661 F.2d at 991; *In re Nelsen,* 24 B.R. 701 (Bkrtcy.D.Or.1982). Ownership of ADS by the Alexanders, Harold Alexander's complete control over the debtor, and capital contributions at least in the form of the customer list from the Plews, support the application of this doctrine without the need to reach for the more stringent theories of alter ego or piercing the corporate veil. More importantly, the identity of interest principle reaches the same result as principles of suretyship for what are essentially the same reasons of equity. The two theories are different expressions of what appear to be the same principles. By application of either theory, the lease between

Harold Alexander and the debtor can be eliminated from consideration.

The effect of the December 23, 1981 exchange of guarantees and assumptions of obligations by the debtor was to add the debtor's presale assets as additional collateral to all of the Plews' property which Harold Alexander, as buyer, concurrently pledged to plaintiffs. Plaintiffs received the Plews' assets as collateral either on the theory of retention of ownership by Alexander of collateral leased to the debtor or, disregarding the lease, on the theory that the Plews' property is itself adequate consideration for the debtor's independent pledge to the plaintiffs. The old ADS property would be additional collateral necessary to insure against subsequent depreciation. Under the latter theory, plaintiffs may, alternatively, retain ADS's old assets as security, either as reasonably equivalent value under 11 U.S.C. § 548(a)(2)(A) or as a lien for value covering depreciation and usage of their collateral under 11 U.S.C. § 548(c) as value given in exchange.

For the foregoing reasons, plaintiffs are entitled to a judgment on their complaint modifying the stay to permit foreclosure of their interests in the collateral, and the defendant-trustee is entitled to no relief on his counterclaim.