In re **CORPORATE JET AVIATION, INC., Debtor.**

**CORPORATE JET AVIATION, INC., Plaintiff,**

v.

**Charles D. VANTRESS, Defendant.**

**Bankruptcy No. 81–05249A.
Adv. No. 82–0651A.**

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Jan. 9, 1985.

Richard A. Katz, James J. Brissette, Katz & Fox, Stacey W. Cotton, Paul W. Bonapfel, Cotton, White & Palmer, Atlanta, Ga., for plaintiff.

David G. Russell, Jo Lanier Meeks, Kutak, Rock & Huie, Atlanta, Ga., for defendant.

W. HOMER DRAKE, Bankruptcy Judge.

## ORDER

On March 18, 1982, the debtor in possession, Corporate Jet Aviation, Inc. ("CJA"), filed a five-count complaint against Charles D. Vantress ("Vantress") seeking recovery of $450,000.00 paid to Vantress by CJA in redemption of 350 shares of CJA common stock. The respective counts of the complaint allege that: I. The stock redemption was a fraudulent transfer under § 548 of the Bankruptcy Code; II. The stock redemption was improper under Georgia law, Ga.Code Ann. § 22–514 (O.C.G.A. § 14–2–93); III. Vantress breached his fiduciary duty as a director of CJA by redeeming his stock; IV. Vantress' right to be paid $450,000.00 should be subordinated to the rights of CJA's creditors; and IV. The $450,000.00 payment from CJA to Vantress was a preferential transfer under § 547 of the Bankruptcy Code. Vantress answered the complaint on April 19, 1982 and asserted a counterclaim based upon an indemnity agreement executed in connection with the stock redemption. Count V of the complaint was dismissed by the Court on March 2, 1983.[1] This case is presently before the Court on CJA's motion for partial summary judgment and Vantress' motions for summary judgment with respect to his alleged liability under Counts I through IV of the complaint and his right to indemnification as set forth in the counterclaim.

By way of background, CJA began business operations in 1976 involving the sale and service of aircraft and aviation equipment as well as providing aircraft charter services at the Peachtree-DeKalb Airport, DeKalb County, Georgia. CJA was a franchisee of the Piper Cheyenne Aircraft Corporation ("Piper") with exclusive sales rights in Georgia, Alabama, Florida and the West Indies. CJA maintained a smaller fixed-base facility in Gadsden, Alabama. The stock redemption in question arose in connection with the sale of a portion of CJA's assets at the Peachtree-DeKalb Airport to Hangar One, Inc. ("Hangar One") on March 28, 1981.

## STATEMENT OF FACTS

The material facts are as follows:

---

1. Upon motion by Vantress, the Court determined that Vantress' position as an equity security holder of CJA did not constitute a "claim" against CJA as defined in Bankruptcy Code § 101(4). Hence, two necessary elements of a preference were found to be absent as a matter of law. First, the $450,000.00 payment to Vantress was not "to or for the benefit of a *creditor*," 11 U.S.C. § 547(b)(1) (emphasis added). Second, the payment was not "for or on account of an antecedent *debt*," 11 U.S.C. § 547(b)(2) (emphasis added).

1. Prior to April 1, 1981, Richard H. Brannan ("Brannan") was the president and majority shareholder of CJA. At that time, Brannan held 62 percent of CJA's common stock, and Vantress owned the remaining 38 percent.

2. Brannan controlled the daily business affairs of CJA. Although Vantress was a director of CJA, he lived on a farm in Montana and made periodic visits to CJA's corporate offices in Atlanta.

3. Brannan, on behalf of CJA, negotiated the sale of a portion of CJA's assets to Hangar One consisting of an office building, shop building, shop equipment and four aircraft hangars located at the Peachtree-DeKalb Airport. CJA retained its Piper franchise along with the real property, inventory and equipment related thereto. The sale did not involve CJA's charter business and fixed-base facility in Gadsden, Alabama.

4. Vantress argues that a condition of CJA's sale of assets to Hangar One was for CJA to have only one shareholder. This fact is in dispute. Vantress bases his position upon a statement from Brannan's deposition in which the sale of assets and stock redemption were described as "interdependent." However, Brannan filed an affidavit dated March 29, 1984 which states that Vantress wanted to end his involvement with CJA; that Vantress would not approve any transaction which did not provide for the purchase of his shares of stock; that Hangar One refused to deal with CJA so long as there was the possibility of a dissenting minority shareholder; and that the only solution at that time was to redeem Vantress' stock. *See* March 29, 1984 Affidavit of Richard H. Brannan.

5. Vantress contends that CJA, by and through its then general counsel, Edward E. Carter ("Carter"), suggested to Vantress that CJA purchase his shares in the company. CJA denies that the initiative for the redemption came from CJA or its general counsel. Rather, CJA's position is that the stock redemption became necessary as a result of Vantress' insistence that his interest in the company be purchased in the course of any transaction intended to deal with CJA's financial difficulty.

6. Carter named a purchase price of $450,000.00 for Vantress' stock. This figure was calculated by estimating the value of CJA's assets remaining after the sale to Hangar One and taking 40% thereof as the value of the stock held by Vantress.

7. A memorandum of intent regarding the sale of assets was executed by CJA and Hangar One on March 6, 1981.

8. A letter agreement dated March 17, 1981 was executed between CJA and Vantress with respect to the stock redemption.

9. Three events occurred on March 18, 1981. First, Vantress tendered his shares to Carter. Second, Vantress resigned from CJA's board of directors. Third, an indemnity agreement between CJA and Vantress was executed by Brannan on behalf of CJA.

10. The sale between CJA and Hangar One was consummated on March 28, 1981.

11. The total price paid by Hangar One was $3,519,583.00. CJA received $1,200,000.00 in cash, a note from Hangar One for $550,000.00, and Hangar One assumed liabilities of CJA in the amount of $1,769,583.00.

12. Should the Court find that the sale of assets was conditioned upon the redemption of Vantress' stock, Vantress raises the question of fact as to whether the sale of assets produced an indirect benefit to CJA sufficient to justify the stock redemption as having been made for adequate consideration.

13. On April 1, 1981, CJA delivered a certified check in the amount of $450,000.00 to Vantress for his stock. Vantress' original investment in the stock was $210,000.00.

14. CJA's accountant, Frank A. Zimmerman ("Zimmerman"), stated during his deposition that the sale to Hangar One increased CJA's assets and decreased its liabilities. Zimmerman subsequently re-

scinded that statement by way of his March 30, 1984 affidavit. The affidavit states that the primary effect of the sale of assets was to increase the liquidity of CJA's assets, but that it is incorrect to characterize the sale of assets as a net $3,519,583.00 infusion of assets or reduction of liabilities. *See* March 30, 1984 Affidavit of Frank A. Zimmerman.

15. At that time, the sale of assets to Hangar One was in the best interests of CJA. Nevertheless, CJA contends that the benefit was of short duration. An affidavit filed by Donald J. Thompson compares the status of CJA following the sale of assets and stock redemption with other aircraft retailers nationally. Dr. Thompson's comparison indicates that the combined effect of the transaction was to seriously drain CJA's cash position and jeopardize CJA's ability to pay its debts as they became due in the ordinary course of business. *See* March 30, 1984 Affidavit of Donald J. Thompson.

16. An audit for the fiscal year ended March 31, 1981 was prepared by an independent certified public accounting firm. The financial statements show that CJA's assets exceeded its liabilities as of March 31, 1981. In addition, CJA had stockholders' equity of $841,192.00, including $480,192.00 in retained earnings. The solvency of CJA both before and after the redemption has been corroborated by the affidavit of M. Ross Lane. *See* March 3, 1984 Affidavit of M. Ross Lane. Mr. Lane states that, in his opinion, the financial strength of CJA was enhanced by the sale of assets and redemption of stock.

17. Nevertheless, CJA argues that the redemption left CJA unable to pay its debts as they became due in the ordinary course of business. *See* March 30, 1984 Affidavit of Donald J. Thompson. Moreover, Brannan filed an affidavit in which he states that CJA was forced to borrow approximately $500,000.00 in April of 1981 to cover previously drawn checks; that CJA had overdrawn its account with the First Georgia Bank in the amount of $48,137.60 by June of 1981; and that CJA was twice unable to pay insurance premiums in July of 1981. *See* March 29, 1984 Affidavit of Richard H. Brannan.

18. In August, 1981, the American National Bank & Trust Company of New Jersey terminated CJA's inventory financing. *See* Exhibit "C" to March 29, 1984 Affidavit of Richard H. Brannan.

19. Piper canceled CJA's franchise in November, 1981. *See* Exhibit "D" to March 29, 1984 Affidavit of Richard H. Brannan.

20. An involuntary petition under Chapter 11 of the Bankruptcy Code was filed against CJA on December 11, 1981, and an Order for relief was entered on December 23, 1981.

## DISCUSSION

### A. STANDARD FOR SUMMARY JUDGMENT

The principal inquiry for the Court is to determine whether there exists a genuine question of material fact. *Commercial Metals Co. v. Walker*, 439 F.2d 1103 (5th Cir.1971); *Communications Workers of America, AFL–CIO v. Western Electric Co.*, 397 F.Supp. 1318 (N.D.Ga.1975), *aff'd*, 558 F.2d 816 (5th Cir.1977). Summary judgment has been characterized as a drastic relief to be applied sparingly. *Screen Advertising Film Fund Corp. v. Buena Vista Distribution Co., Inc.*, 100 F.R.D. 14 (N.D.Ga.1983). Summary judgment is proper only when there is no genuine issue as to any material fact. *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406 (5th Cir.1980); *Lester v. Hanover Insurance Co.*, 488 F.2d 976 (5th Cir.1974). If factual issues are present, the Court must deny summary judgment. *Griffis v. Delta Family-Care Disability*, 723 F.2d 822 (11th Cir. 1984).

As illustrated in the above statement of facts, there exists at least a slight doubt as to certain material facts. It is incumbent upon the Court to resolve all reasonable doubt in favor of the opposing party. *United States v. Diebold, Inc.*, 369 U.S.

654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Griffis v. Delta Family-Care Disability*, 723 F.2d 822 (11th Cir.1984); *Casey Enterprises, Inc. v. American Hardware Mutual Insurance Co.*, 655 F.2d 598 (5th Cir. 1981); *Cable Holdings of Georgia, Inc. v. Home Video, Inc.*, 572 F.Supp. 482 (N.D. Ga.1983); *Jones v. Evans*, 544 F.Supp. 769 (N.D.Ga.1982). The following excerpt from a Fifth Circuit Court of Appeals decision is pertinent:

> One who moves for summary judgment is not entitled to a judgment "merely because the facts he offers appear more plausible than those tendered in opposition, or because it appears that the adversary is unlikely to prevail at trial."

*Hayden v. First National Bank of Mt. Pleasant, Texas*, 595 F.2d 994 (5th Cir. 1979) (citing 10 Wright & Miller & Kane, *Federal Practice & Procedure* § 2725).

## B. COUNT I OF THE COMPLAINT

Section 548 of the Bankruptcy Code states in relevant part as follows:

(a) *The trustee may avoid any transfer of an interest of the debtor in property,* or any obligation incurred by the debtor, *that was made* or incurred on or *within one year before the date of the filing of the petition, if the debtor—*

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer occurred or such obligation was incurred, indebted; or

(2)(A) *received less than a reasonably equivalent value in exchange for such transfer* or obligation; *and*

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) *was engaged in business,* or was about to engage in business or a transaction, *for which any property remaining with the debtor was an unreasonably small capital;* or

(iii) intended to incur, or believed that the debtor would incur, debts that would

be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548 (emphasis added). CJA's allegation under Count I is based solely on § 548(a)(2)(A) and (B)(ii). In other words, CJA must prove that less than a reasonably equivalent value was received from Vantress in the stock redemption *and* that CJA was engaged in a business for which the property remaining with CJA was an unreasonably small capital. CJA's motion for partial summary judgment addresses only the first prong of Count I. Vantress argues that one or both elements of a fraudulent transfer are absent as to warrant judgment in his favor as a matter of law.

CJA draws support for its position by analogizing this case to the situation in which a stockholder redeems his stock in exchange for a note from the redeeming corporation. CJA cites a compelling list of authority for the proposition that, upon the intervention of bankruptcy prior to payment of such a note, courts have consistently avoided the ascent by the stockholder to creditor status, either by denying the stockholder's claim or by subordinating it to the claims of other creditors. *Robinson v. Wangemann*, 75 F.2d 756 (5th Cir.1935); *Boggs v. Fleming*, 66 F.2d 859 (4th Cir. 1933); *First Trust Company v. Illinois Central Railroad Company*, 256 Fed. 830 (8th Cir.1919); *In re O'Gara & Maguire*, 259 Fed. 935 (D.N.J.1919); *In re Bell Tone Records, Inc.*, 86 F.Supp. 806 (D.N.J.1949); *In re Dawson Brothers Construction Company*, 218 F.Supp. 411 (N.D.N.Y.1963); 4 A.L.R.Fed. 654.

The leading case cited by CJA is *Robinson v. Wangemann, supra*. In *Robinson*, the debtor corporation redeemed the stock of its president in exchange for a $55,-000.00 note. At the time of the redemption, the corporation was solvent and its surplus cash in excess of its liabilities was greater than $55,000.00. The note was not paid upon its due date, and several renewal notes were issued. In a bankruptcy setting, the Fifth Circuit Court of Appeals ruled that a claim upon one of the renewal

notes could properly be filed but was subordinate to the claims of other creditors. The rationale stated by the Court is as follows:

> A transaction by which a corporation acquires its own stock from a stockholder for a sum of money is not really a sale. *The corporation does not acquire anything of value equivalent to the depletion of its assets, if the stock is held in the treasury, as in this case.* It is simply a method of distributing a proportion of the assets to the stockholder. The assets of a corporation are the common pledge of its creditors, and stockholders are not entitled to receive any part of them unless creditors are paid in full. When such a transaction is had, regardless of the good faith of the parties, it is essential to its validity that there be sufficient surplus to retire the stock, without prejudice to creditors, at the time payment is made out of assets.... It is immaterial that the corporation was solvent and had sufficient surplus to make payment when the agreement was entered into. *It is necessary to a recovery that the corporation should be solvent and have sufficient surplus to prevent injury to creditors when the payment is actually made.*

*Robinson v. Wangemann*, 75 F.2d at 757–758 (emphasis added).

It is beyond dispute that a corporation receives nothing of value for the benefit of creditors by redeeming stock to be held by the corporation as treasury stock. *Robinson v. Wangemann, supra; Matter of Hawaii Corp.*, 694 F.2d 179, 181 (9th Cir.1982) ("A corporation that acquires by purchase its own stock in fact distributes a portion of its assets to the selling stockholder."); *In re Roco Corp.*, 701 F.2d 978, 982 (1st Cir.1983); *McConnell v. Estate of Butler*, 402 F.2d 362, 366 (9th Cir.1968); *Fultz v. Anzac Oil Corp.*, 240 F.2d 21, 22–24 (5th Cir.1957); *Dorsey Co. v. Commissioner of Internal Revenue*, 76 F.2d 339, 340 (5th Cir.1935); *In re Bell Tone Records*, 86 F.Supp. 806, 810 (D.N.J.1949). The Court in *In re Roco Corp., supra*, noted the

effect of a redemption on the corporation's balance sheet:

> Indeed, Roco received nothing but all of its outstanding stock. *We agree with the bankruptcy court that this stock was virtually worthless to Roco.* Under generally accepted accounting principles this treasury stock would be reported on the balance sheet of Roco as a reduction of stockholders' equity, not as an asset. *See generally* R. Anthony & J. Reese, *Accounting Principles* 215 (4th ed. 1979) ("Treasury stock is clearly not an 'economic resource' of an entity."). *As the appellate panel noted, treasury stock is a form of shareholder distribution from which the corporation receives no assets.* When a corporation purchases treasury stock it reduces capitalization.

*In re Roco Corp.*, 701 F.2d at 982 (emphasis added). *See also* Manning, *A Concise Textbook on Legal Capital* 130 (2d ed. 1981) ("[A] purchase by the corporation of its own stock is a form of shareholder distribution from which the corporation receives nothing, which is obnoxious to creditors, and which, depending on the price, may prejudice or favor shareholders whose shares were not bought in."); Ballentine, "The Curious Fiction of Treasury Shares," 34 Cal.L.Rev. 537, 540 (1946) ("The purchase by a corporation of its own shares necessarily reduces the net assets and should be treated as reducing surplus....").

In *Roco*, the First Circuit Court of Appeals affirmed the conclusion reached by both lower courts that a $300,000.00 note and security interest transferred by the debtor corporation to its sole shareholder within one year of bankruptcy in redemption of all the corporation's outstanding stock was a fraudulent conveyance under Bankruptcy Code § 548(a)(2). The First Circuit declined to adopt a blanket rule that no stock redemption could pass muster under § 548(a)(2)(A). For example, the First Circuit stated that a redemption to fund an executive benefit plan or for use in converting convertible bonds or preferred stocks might survive the "reasonably equivalent value" test. However, in *Roco*, as in *Rob-*

*inson* and the case *sub judice,* the redeemed shares were held as treasury stock. If the Court were to examine the redemption of Vantress' stock as a singular transaction, the inescapable conclusion would be that CJA received less than a reasonably equivalent value for its $450,000.00 cash outlay.

■ Nevertheless, Vantress raises the possibility that the redemption must be considered as an integral part of the sale of assets to Hangar One. Brannan stated in his deposition that the sale of assets and stock redemption were "interdependent." The exact inference to be drawn from this statement is subject to question. Brannan's March 29, 1984 affidavit offers the logical explanation that the redemption of ·Vantress' stock became necessary only when Vantress threatened to dissent from the asset sale. The view put forth by Brannan's affidavit is corroborated by the fact that Vantress was concerned that CJA was not being properly managed, Defendant's Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment at 4–5, and that Vantress was aware that "CJA had been experiencing financial difficulties and needed additional capital." *Id.* at 14. Moreover, there is no apparent reason why Hangar One would have an interest in the capital structure of CJA, except insofar as Hangar One did not want its negotiations for the sale of assets to become a nullity due to the dissent of a minority shareholder. However, construing all reasonable inferences in favor of Vantress, the Court must give some credence to the literal meaning of Brannan's statement that the sale of assets and redemption were, in fact, interdependent. This question of fact should most appropriately be resolved at trial upon examination and cross-examination of Brannan. In addition, the record thus far is noticeably devoid of any statement by representatives of Hangar One as to Hangar One's perception of the stock redemption in relation to the sale of assets.

Vantress cites four cases in support of its argument that the consideration to CJA for the $450,000.00 to Vantress came from Hangar One via the sale of assets. *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979 (2d Cir.1981); *In re Royal Crown Bottlers of North Alabama, Inc.,* 23 B.R. 28 (Bkrtcy.N.D.Ala.1982); *In re Eidson,* 10 B.R. 432 (Bkrtcy.N.D.Ga.1981); *In re Alexander Dispos-Haul Systems, Inc.,* 36 B.R. 612 (Bkrtcy.D.Ore.1983). The case law is clear that the consideration for a transfer by the debtor need not come from the transferee, but may come from a third party. *Rubin v. Manufacturers Hanover Trust Co., supra; In re Royal Crown Bottlers of North Alabama, Inc., supra; In re Alexander Dispos-Haul Systems, Inc., supra.* However, the cases relied upon by Vantress do not fit nicely with the facts at hand.

In *Rubin,* the bankruptcy trustee of two debtor corporations sought to recover as a fraudulent transfer under § 67d of the Bankruptcy Act certain funds and securities pledged to secure loans made to affiliates of the debtor corporations. The general rule regarding transfers by a bankrupt for the benefit of a third party was stated by the Second Circuit as follows:

> Accordingly, courts have long recognized that "[t]ransfers made to benefit third parties are clearly not made for a 'fair' consideration," and, similarly, that "a conveyance by a corporation for the benefit of an affiliate [should not] be regarded as given for fair consideration as to the creditors of the conveying corporations." 4 *Collier on Bankruptcy* ¶ 6733, at 514.1–14.2 (14th ed. 1978) (citing cases).

*Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d at 991. Yet, there is a well-recognized exception to the general rule:

> The cases recognize, however, that a debtor may sometimes receive "fair" consideration even though the consideration given for his property or obligation goes initially to a third person. As we have recently stated, although "transfers *solely* for the benefit of third parties do not furnish fair consideration" under § 67(d)(1)(e), the transaction's benefit to the debtor "need not be direct; it may

come indirectly through benefit to a third person." *Klein v. Tabatchnick*, 610 F.2d 1043, 1047 (2d Cir.1979) (emphasis added). *Accord, Williams v. Twin City Co.*, 251 F.2d 678, 681 (9th Cir.1958); *McNellis v. Raymond*, 287 F.Supp. 232, 238–39 (N.D.N.Y.1968), *aff'd in relevant part*, 420 F.2d 51 (2d Cir.1970).

*Id.*

The standard laid down by the Second Circuit in *Rubin* when dealing with such indirect benefit cases is that the consideration given to the third person must ultimately land in the debtor's hands or otherwise confer an economic benefit upon the debtor—provided that the value of the benefit received by the debtor approximates the value of the property transferred by the debtor. *Id.* at 991–992. Hence, the Second Circuit determined that the lower Court erred in concluding that the debtor received a fair consideration for the securities and funds transferred, where the lower Court simply examined the value of the transfer in relation to the amount of the loan made by the bank to the affiliates rather than looking at the economic benefit that the loan to the affiliates in turn conferred upon the debtor. The Second Circuit stated in its own words as follows:

> In a three-sided transaction such as that presented here, it is not enough merely to compare the absolute amount of the third person's debt with the amount of security given by the bankrupt. The trustee, who has the burden of proving that the transaction was "without fair consideration," *see* 4 *Collier on Bankruptcy, supra,* ¶ 67.43, at 620–21 (citing cases), could establish lack of fair consideration under § 67(d) by proving that the value of what the *bankrupt* actually received was disproportionately small compared to the value of what it gave.

*Id.* at 993.

The Second Circuit in *Rubin* posed the hypothetical situation of an individual debtor who repays bank loans made to a corporation, where the proceeds of the loan actually passed through the corporation to the individual. In that instance, the corporation was characterized as merely a conduit for obtaining the loan and transferring the proceeds to the individual, and the repayment of the loan by the individual was stated, as a matter of dictum, to be a transfer made for a fair consideration. Another situation in which fair consideration might be found is a novation where the debtor's discharge of a third person's debt also discharges his own debt to the third person. "In each of these situations, the net effect of the transaction on the debtor's estate is demonstrably insignificant, for he has received, albeit indirectly, either an asset or the discharge of a debt worth approximately as much as the property he has given up or the obligation he has incurred. Thus, although these 'indirect benefit' cases frequently speak as though an 'identity of [economic] interest' between the debtor and the third person sufficed to establish fair consideration, the decisions in fact turn upon the statutory purpose of conserving the debtor's estate for the benefit of creditors." *Id.* at 992 (citations omitted).

The policy behind § 67d, as stated in *Rubin,* to preserve the debtor's estate for the benefit of creditors, is identical to the rationale of those cases which denied or subordinated the claim of a shareholder-turned-creditor. In *Matter of Hawaii Corp., supra,* the capital stock of a corporation was described as "a trust fund for its creditors." *Matter of Hawaii Corp.,* 694 F.2d at 181. *Accord, Robinson v. Wangemann,* 75 F.2d at 757. Assuming *arguendo* that the stock redemption was a necessary component of the transaction with Hangar One, the ultimate resolution of the first prong of Count I turns on a comparison of the net benefit to CJA's estate from the sale of assets in relation to the $450,000.00 payment to Vantress. There is no evidence in the record as to the value of the assets given up by CJA for the $3,519,583.00 purchase price paid by Hangar One. Yet, there is no indication in the record that the assets were sold for other than their fair market value in an arms-length transaction.

The remaining three cases cited by Vantress do not alter the parameters for evaluating Vantress' position that were previously derived from *Rubin*. In *In re Eidson, supra,* this Court sustained the transfer by a debtor of his one-half interest in property worth $11,750.00 to his wife for a recited consideration of $10.00 plus love and affection. The crucial factor was that the wife subsequently pledged the property as collateral for a loan and used the proceeds of the loan to pay off nearly $8,000.00 of the debtor's liabilities. Furthermore, more than $7,000.00 worth of liens remained enforceable against the property, which was actually overencumbered at the time of the transfer. This Court viewed the loan transaction as part of the initial transfer. Therefore, the wife effectively served as a conduit in the pledge of property and the use of the loan proceeds for the debtor's ultimate benefit.

The scenario in *In re Royal Crown Bottlers of North Alabama, Inc., supra,* was slightly more complicated. The transaction in question in *Royal Crown* was a $35,000.00 payment allegedly made by the debtor/subsidiary to an individual who was formerly the operations manager, vice president, and director of the parent company, Royal Crown Bottling Company of Boaz, Inc. ("R–C Boaz"). Both the debtor and R–C Boaz were insolvent, and R–C Boaz sought financial help from the franchisor, the Royal Crown Cola Company in Chicago ("Royal Crown"). Royal Crown agreed to supply the requested financial aid upon the condition that R–C Boaz reorganize its management. The $35,000.00 payment represented the initial installment of the repurchase of stock from the principal of R–C Boaz, whose interest in the company was terminated as part of the mandatory reorganization.

The Bankruptcy Court in *Royal Crown* acknowledged the general rule that "an insolvent debtor receives 'less than a reasonably equivalent value' where it transfers its property in exchange for a consideration which passes to a third party." *In re Royal Crown Bottlers of North Alabama, Inc.,* 23 B.R. at 30. An exception was stated to exist "if the debtor and the third party are so related or situated that they share an 'identity of interests,' because what benefits one will, in such case, benefit the other to some degree." *Id.* The consideration in *Royal Crown*—principally, the financial aid from Royal Crown—flowed to R–C Boaz in the first instance. Nevertheless, the Bankruptcy Court declined to overturn the transfer by the debtor as a fraudulent conveyance under § 548 of the Bankruptcy Code. The debtor and R–C Boaz were held to have an identity of interests, because the debtor was a distributor of a substantial part of the products bottled by R–C Boaz. Since both corporations were insolvent and financial aid would not have been forthcoming from any source other than the franchisor, the Bankruptcy Court stated that the financial aid to R–C Boaz was "a special and significant financial benefit to the debtor...." *Id.*

The Court in *Royal Crown* did not reach the step of comparing in monetary terms the "special and significant financial benefit" received by the debtor as a result of the financial aid to R–C Boaz in relation to the $35,000.00 transfer. After outlining the legal precepts under § 548, the Bankruptcy Court denied the trustee's avoidance action for a fundamental evidentiary deficiency. The Court noted that the debtor and R–C Boaz commingled their funds and financial records, and the trustee failed to show that the $35,000.00 payment was made with funds in which the debtor had an interest.

Finally, the Court in *In re Alexander Dispos-Haul Systems, Inc., supra,* restated the basic principle from *Rubin* that the consideration for a transfer may come indirectly from a third party. The transaction at issue in *Alexander* was a guarantee for which no consideration was paid directly by the beneficiary to the corporate debtor/guarantor. The guarantee was given by the corporation in conjunction with the purchase of assets by the principal of the corporation. Because the principal conveyed certain of his acquired assets to the corporation, the Bankruptcy Court found

that the guarantee was supported by a reasonably equivalent consideration.

In sum, these cases do not shed much light on Vantress' contention that the consideration to CJA for the $450,000.00 payment to Vantress originated from Hangar One. Yet, because the questions pertaining to interdependence and valuation are unsettled, summary judgment is not appropriate in favor of either party as to the first prong of Count I of the complaint.

Vantress also contends that he is entitled to summary judgment on the averment that CJA had insufficient capital remaining after the sale of assets and stock redemption to pay its debts as they became due in the ordinary course of business. Vantress relies primarily upon the financial statements for the fiscal year ended March 31, 1981, which show that CJA was solvent after the transactions. However, Brannan's March 29, 1984 affidavit suggests that CJA was not able to pay its debts without incurring substantial additional indebtedness. Construing all reasonable inferences in favor of CJA, the Court cannot possibly sustain Vantress' motion for summary judgment as to the second prong of Count I on the basis of the present record.

## C. COUNT II OF THE COMPLAINT

In Count II of the complaint, CJA argues that the stock redemption was improper under state law. O.C.G.A. § 14–2–93(b) (Ga.Code Ann. § 22–514(b)) states as follows (emphasis added):

> No redemption of redeemable shares shall be made by a corporation when it is insolvent or when such redemption would render it insolvent or which would reduce the net assets below the aggregate amount payable to the holders of shares having senior or equal preferential rights to the assets of the corporation upon liquidation.

"Insolvency" is defined by statute to mean "that a corporation is unable to pay its debts as they become due in the usual course of business or that a corporation has liabilities in excess of assets." O.C.G.A. § 14–2–2(8). *Cf.* Ga.Code Ann. § 22–102(p). The question of CJA's ability to pay its debts as they became due in the usual course of business is subject to dispute, and Vantress is not entitled to summary judgment on Count II simply because CJA's assets exceeded its liabilities on March 31, 1981.

## D. COUNT III OF THE COMPLAINT

The third count of the complaint avers that Vantress breached his fiduciary duty as a principal of CJA by redeeming his stock. Vantress responds to this averment by noting that he resigned from his position as director of CJA on March 18, 1981, which was ten days prior to the sale of assets and fourteen days prior to his receiving the $450,000.00 from CJA. However, the memorandum of intent regarding the sale of assets was executed on March 6, 1981, and the letter agreement concerning the redemption was made on March 17, 1981. The fiduciary duty of good faith and due care owed by a corporation's director is clearly stated in Georgia law. *Super Valu Stores, Inc. v. First National Bank of Columbus,* 463 F.Supp. 1183 (M.D.Ga. 1979); O.C.G.A. § 14–2–152 (Ga.Code Ann. § 22–713). Vantress has not shown that the timing of his resignation precludes an inquiry into whether or not Vantress fulfilled these duties.

## E. COUNT IV OF THE COMPLAINT

The fourth count of the complaint alleges that Vantress' right to retain the $450,000.00 payment should be subordinated to the rights of CJA's unsecured creditors. The test for exercising the doctrine of equitable subordination was set forth by the Fifth Circuit Court of Appeals in *In re Mobile Steel Co.,* 563 F.2d 692, 699–700 (5th Cir.1977) (citations omitted):

(i) The claimant must have engaged in some type of inequitable conduct.

(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

A principle in applying this tripartite test is that the dealings of fiduciaries with their corporation

> are subjected to rigorous scrutiny and where any of their contracts or engagements is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.

*Id.* at 701 (citing *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939)).

■ Vantress' motion for summary judgment as to Count IV of the complaint is premature in light of this heavy burden of proof upon Vantress. Although the record is not completely developed, the inference that CJA asks the Court to draw is that Vantress acted in his own self interest to the detriment of CJA by threatening dissent from the sale of assets—a transaction which by all indication was in the best interest of CJA at the time it was consummated—in order to force CJA to purchase his shares in the floundering corporation at a sizable profit. CJA's view has a sufficient evidentiary basis to compel the denial of Vantress' motion for summary judgment with respect to the issue of equitable subordination.

## F. VANTRESS' COUNTERCLAIM

Vantress asserted a counterclaim against CJA based upon the March 18, 1981 indemnity agreement in which CJA agreed as follows:

> CJA does hereby agree to indemnify and hold Vantress harmless from any and all claims actually made against Vantress arising out of any of the following acts, events, or occurrences occurring after the completion of the sale of Vantress' interest in Corporate Jet Aviation, Inc., a Georgia corporation to Corporate Jet Aviation, Inc., to-wit:
>
> (a) The operation of Corporate Jet Aviation Inc.'s business operations;
>
> (b) Any claims of creditors of Corporate Jet Aviation, Inc.

Vantress argues that the indemnity agreement renders CJA liable to Vantress for any and all amounts that Vantress might be ordered to pay to CJA as a result of this adversary proceeding, and Vantress' motion for summary judgment seeks a ruling by the Court to that effect.

■ Vantress' motion must be denied for two reasons. First, the literal terms of the indemnity agreement do not purport to require indemnification arising from an action under the avoidance powers of the Bankruptcy Code to set aside the stock redemption. Second, Vantress has cited no authority for the proposition that a party can contractually insulate a transaction from the power of the trustee in bankruptcy to recover fraudulently transferred assets for equitable distribution to unsecured creditors.

## CONCLUSIONS OF LAW

On the basis of the foregoing, CJA's motion for partial summary judgment, Vantress' motion for summary judgment as to the four remaining counts of the complaint, and Vantress' motion for summary judgment as to his counterclaim shall be and are hereby DENIED for failure of the respective moving parties to carry the requisite evidentiary burden.

IT IS SO ORDERED.