NATIONAL INDEPENDENT THEATRE EXHIBITORS, INC., Plaintiff,

James T. Patterson, Sr., Screen Advertising Film Fund, Inc., Plaintiffs-Appellants,

v.

BUENA VISTA DISTRIBUTION COMPANY, et al., Defendants-Appellees.

No. 83–8638.

United States Court of Appeals, Eleventh Circuit.

Dec. 12, 1984.

Rehearing and Rehearing En Banc Denied Feb. 5, 1985.

James T. Patterson, Sr., pro se.

William N. Withrow, Jr., J. Kirk Quillian, Atlanta, Ga., for Columbia, Metro-Goldwyn, Paramount, 20th Century, United & Warner.

Daniel R. Murdock, New York City, for Buena Vista.

Before TJOFLAT and HATCHETT, Circuit Judges, and GARZA *, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

This private antitrust·dispute concerns the alleged attempt of eight major

* Honorable Reynaldo G. Garza, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

motion picture distributors to prevent a potential competitor from entering the marketplace. The district court entered summary judgment for the distributors. 100 F.R.D. 14. This appeal questions that decision and several of the district court's procedural and discovery rulings. We find no error in any of these latter rulings but vacate the summary judgment because certain material fact issues remain to be litigated.[1]

## I.

Buena Vista Distribution Company, Inc., Columbia Pictures Industries, Inc., Metro-Goldwyn Mayer, Inc., Paramount Pictures Corporation, Twentieth Century Fox Film Corporation, United Artists Corporation, Universal Film Exchanges, Inc., and Warner Brothers Distributing Corporation, the eight defendants below, collectively supply eighty-five percent of the high quality motion pictures exhibited at theatres in the United States. They were producing approximately one hundred such motion pictures a year when this controversy arose. All eight belong to the Motion Picture Association of America (MPAA), a trade organization composed of the ten largest film distributors in the country.

National Independent Theatre Exhibitors, Inc. (NITE) is a trade association of independent movie theatre exhibitors who own and operate some five thousand screens in the continental United States. They formed NITE to protect and promote their interests. James Thomas Patterson, Sr., an independent theatre owner-operator, is NITE's president and a member of its board of directors.

In the early 1970's, independent theatres found themselves in a serious financial crisis. Faced with growing competition from large circuit exhibitors, shrinking attendance, and rising film rentals, they found it difficult to obtain top quality films for exhibition. In 1976, NITE decided that the solution for this problem was to increase the supply of quality films to the independent distributors. A greater variety of movies, NITE assumed, would foster more vigorous price competition by all distributors, resulting in lower film rentals, and would permit the independent theatres to offer movies to their patrons that were not being shown by most of their competitors. In addition, the lower admission prices and greater variety would increase public interest in going to the movies. NITE concluded that the major film producers lacked the economic incentive to cure the supply problem it perceived and that it should enter the production and distribution market. NITE lacked the financial resources to take this step, however.

In an effort to raise the capital that would be necessary to finance the production of high quality films, NITE's board of directors, in April 1977, created a "Film Fund," to which its members could make donations, and gave Patterson the job of soliciting their contributions. He, in turn, devised the following plan. NITE's member theatres would show several minutes of on-screen advertising before each feature film and contribute revenues generated by this advertising to the Film Fund. A board of advisors, chosen by the participating independent theatre owners, would select the movies the Fund would finance. The Film Fund would then contract with independent motion picture companies to produce the movies. The NITE members who participated in this voluntary screen advertising program would receive a discount on the rental of these movies in return for their contributions to the Fund. *Daily Variety*, a leading trade newspaper, reported on the NITE Film Fund in a front-page story on April 26, 1977. The story related strong interest in the program from film producers and exhibitors alike.

---

**1.** In determining whether the existence of material fact issues precluded the entry of summary judgment in the district court, we treat the evidence presented to the district court in the light most favorable to the nonmovant plaintiffs.

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Thrasher v. State Farm Fire & Casualty Co.*, 734 F.2d 637, 638 (11th Cir.1984).

In June 1977, NITE entered into a four-year contract with Cinemavision, Inc., a company engaged in the selling of on-screen theatre advertising, for the sale of advertising space on NITE's members' movie screens. The contract provided that at least fifty percent of the net revenues Cinemavision collected from its advertisers for the participating theatres would be paid directly to the Film Fund. The contract required NITE to use its best efforts to solicit exhibitors to participate in the screen advertising program. NITE anticipated that its Film Fund would generate $42 million from the program over the four-year contract period.

NITE's board of directors decided that the Film Fund should be organized as a separate legal entity and persuaded Patterson to incorporate Screen Advertising Film Fund Corporation (SAFFCO). SAFFCO in turn contracted with NITE and Cinemavision to administer the program. The contract provided that SAFFCO would receive the theatre contributions generated by the on-screen advertising and would retain two percent of these contributions as a profit margin to pay Patterson a salary. Cinemavision eventually enrolled independent exhibitors representing four thousand screens to display advertisements, two thousand of whom agreed to contribute their advertising revenues to SAFFCO.

On September 27–28, 1977, at a NITE regional meeting held in St. Louis, Cinemavision announced that the screen advertising program would be launched in late October with a one thousand theatre test run. A reporter from *Daily Variety* attended the meeting and filed a long story entitled "NITE's Screen Advertising Network Gets 1000-Theatre Test Run Beginning Oct. 24," which appeared on the front page of the September 29 edition. The story stated, in part:

> Following the tryout, additional theatres in other markets will be added until all 4200 screens signed up for the program are unreeling soft-sell commercials, William Woosley of Cinemavision told

NITE's national conference of small circuits and independent buyers.

> Included in that number, per NITE prexy Tom Patterson, are 2000 screens (not all NITE members) which will be donating proceeds from the ads to the Screen Advertising Film Fund Corp. (SAF[F]CO), the NITE group established to purchase, finance and produce features.

> All exhibitors signed ·by Patterson have agreed to put three minutes of advertising on their screens before showing the feature for four years. Over that period, Patterson estimated, $42,000,000 would be generated for SAF[F]CO from the 2000 subscribing screens.

A second *Daily Variety* reporter in Hollywood, California placed phone calls to the major motion picture distributors to obtain their response to the NITE·film advertising program. Senior executives from Universal Pictures, Buena Vista, Twentieth Century Fox, Columbia, and Warner Brothers returned the reporter's calls. All the executives were familiar with the program. They all voiced strong opposition to NITE's program because they feared the advertisements would "clutter the screen" and alienate theatre patrons. The executives' responses were quoted in the September 29, September 30, and October 5, 1977 editions of *Daily Variety*.

The MPAA Advertising-Publicity Committee met on October 27, 1977 and discussed the NITE Film Fund. Richard Kahn, chairman of the committee and vice president of Metro-Goldwyn Mayer, told a *Daily Variety* reporter that the committee unanimously voted to take a stand urging theatres not to exhibit screen ads. A story on the cover of the November 4, 1977 edition of *Daily Variety* reported that

> A new voice—that of the ad-pub committee of the Motion Picture Association of America—has been added to the campaign to dissuade theatre owners from participating in the screen advertising program through which the National Independent Theatre Exhibitors Associa-

tion hopes to generate financing for new feature film product.

Richard Kahn, ad-pub-exploitation v.p. of MGM, chairman of the MPAA panel, yesterday disclosed a unanimously approved committee stand deploring the "rebirth" of screen advertising, and urging exhibitors "to keep their screens free of nonentertainment oriented clutter."

Action of the ad-pub committee was endorsed by MPAA president Jack Valenti, and the association's advertising chief, Bethlyn Hand. Both attended the session, along with representatives of Universal, United Artists, Warner Bros. and MGM. Nonmember observers from American International and First Artists concurred.

On October 31, 1977, Twentieth Century Fox issued a statement that it would require all future exhibitors of its films to pay it a percentage of any revenues they might derive from on-screen advertising. The purpose of this statement was to discourage theatre participation in screen advertising programs.

On November 22, 1977, Warner Brothers mailed out bid solicitations for "Superman," one of the most commercially important movies of the year. The bid solicitation stated that theatres exhibiting screen ads would not be considered eligible for licensing the new film. The clear intent was to discourage screen advertising programs.

As a result of the major distributors' coercive activities, numerous theatre exhibitors withdrew from the NITE program; they could not afford to lose their principal sources of supply. At the same time, Cinemavision tried to separate itself from SAFFCO and NITE in order to save its business. These efforts came too late, and in 1978 Cinemavision went out of business.

NITE, Patterson, and SAFFCO, invoking section 4 of the Clayton Act, 15 U.S.C. § 15 (1982), brought this private anti-trust action against the eight defendant film distributors we have referred to *supra*, alleging that they had conspired to destroy SAFFCO, in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 (1982), because SAFFCO threatened to compete vigorously in their oligopolistic market. The plaintiffs alleged that the statements by the defendants' executives concerning the NITE Film Fund and the subsequent meeting of the MPAA Advertising-Publicity Committee evidenced this conspiracy and that Warner Brothers' and Twentieth Century Fox's threatened boycott of any exhibitor who participated in the on-screen advertising program was in pursuance thereof. The conspirators knew, plaintiffs alleged, that the exhibitors would respond to such threats by refraining from on-screen advertising.

After answering plaintiffs' complaint, the defendants moved for summary judgment on the ground that plaintiffs lacked standing to prosecute their antitrust claims. Following a period of discovery limited to the standing issue, the court granted the defendants' motions as to Patterson and NITE because they were not within the target area of the alleged antitrust violations.

The parties subsequently engaged in extended discovery on the merits of SAFFCO's claims, and the defendants again moved for summary judgment. Before the court could hear argument on their motions, though, SAFFCO's attorneys withdrew from the case. SAFFCO obtained new counsel, but Patterson soon became dissatisfied with his performance and sought to represent SAFFCO himself. The court refused to permit him to do so, however. Patterson then tried another approach; he dissolved SAFFCO and moved the court to substitute him for the company as party plaintiff. The court denied his motion and proceeded to consider the defendants' motions for summary judgment. It concluded that the defendants' actions were not responsible for SAFFCO's alleged injury and consequently granted summary judgment for the defendants.

SAFFCO and Patterson appeal. SAFFCO contends that the court erred in granting the distributors summary judgment because material facts remained unresolved.

Patterson contends that the court erred in concluding that he lacked standing to sue under the antitrust laws. Both appellants challenge the trial court's denial of Patterson's motion for substitution as party plaintiff and its disposition of several procedural and discovery matters. We discuss these points in order.

## II.

■ The prerequisites to a private cause of action under section 4 of the Clayton Act are well established: the plaintiff must show (1) a violation of the antitrust laws, in this case sections 1 and 2 of the Sherman Act, (2) injury to its "business or property," and (3) a causal relationship between the antitrust violation and the injury. *Nichols v. Mobile Board of Realtors, Inc.*, 675 F.2d 671, 675 (5th Cir. Unit B 1982);[2] *Jot-Em-Down (JEDS) Store, Inc. v. Cotter & Co.*, 651 F.2d 245, 247 (5th Cir.1981).[3] The last two elements require the valuation of the plaintiff's injury in terms of money damages with some degree of certainty. *Id.*

In the instant case, the distributors moved for summary judgment against SAFFCO on the ground that SAFFCO failed to establish the third element of its antitrust claims, the causal relationship between the distributors' alleged anticompetitive behavior and SAFFCO's injury. The distributors presented a two-part argument. First, the distributors noted that SAFFCO failed to obtain contributions from exhibitor on-screen advertising revenues because Cinemavision collapsed and that Cinemavision collapsed because it could not persuade anyone to advertise on its network of theatre screens. Second, they pointed out that there was no proof that they had ever contacted any of Cinemavision's potential advertisers in an attempt to discourage them from engaging in on-screen advertising. Absent any interference on their part with Cinemavision's

sources of income, the distributors concluded, they could not be held responsible for SAFFCO's injury. The district court accepted their argument and gave them summary judgment.

■ We begin our assessment of the validity of the distributors' argument, and hence the summary judgment, by observing that the law does not require an antitrust plaintiff to show that the defendant's wrongful action was the *sole* proximate cause of the injury sustained. The plaintiff need only prove, with a fair degree of certainty, that defendant's illegal conduct *materially contributed* to the injury. *Comfort Trane Air Conditioning v. Trane Co.*, 592 F.2d 1373, 1383 (5th Cir. 1979); *Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 317 (5th Cir.1978); *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 20 (5th Cir.), *cert. dismissed*, 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974). "It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4 [of the Clayton Act]." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571–72 n. 9, 23 L.Ed.2d 129 (1969). The causation argument the distributors advanced in the district court, and repeat, here, ignores this rule of law, for it does not address the question of whether the distributors' threats to boycott or otherwise penalize any exhibitor who engaged in on-screen advertising played a role in the decision of Cinemavision's putative advertisers not to participate in its advertising program.

■ In determining whether such threats, especially Twentieth Century Fox's and Warner Brothers' communications to exhibitors of October 31 and November 22,

**2.** In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982), this court adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981.

**3.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

1977, *supra,* played a role in the advertisers' decisions, we must view the evidence in a light most favorable to SAFFCO. In doing so, we conclude that a large number of movie theatres, both those who had agreed to contribute to SAFFCO's Film Fund and those who had not, withdrew from the Cinemavision's screen advertising program because of the distributors' coercive conduct and that such withdrawal was a *natural cause* of Cinemavision's failure. These exhibitors could not risk losing their supply of motion pictures and had no choice except to refuse to exhibit on-screen advertising. We think a jury could infer that this significant contraction in the number of screens participating in Cinemavision's advertising program reduced its attractiveness as an advertising medium. A network of five thousand screens was obviously more attractive than one with only two thousand screens to national advertisers who wished to reach the largest audience possible. In sum, the inference that the distributors' conduct may have caused SAFFCO's injury was sufficient to preclude the entry of summary judgment. *Thrasher v. State Farm Fire & Casualty Co.,* 734 F.2d 637, 638 (11th Cir.1984); *Griffis v. Delta Family-Care Disability,* 723 F.2d 822, 823–24 (11th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 3514, 82 L.Ed.2d 823 (1984).

### III.

■ Patterson challenges the district court's conclusion that he lacked standing to pursue his antitrust claims. His challenge lacks merit. Standing to prosecute a private antitrust action under section 4 of the Clayton Act requires the plaintiff to prove that "he is within that sector of the economy which is endangered by a breakdown of competitive conditions in a particular industry." *Jeffrey v. Southwestern Bell,* 518 F.2d 1129, 1131 (5th Cir.1975). *See Construction Aggregate Transport, Inc. v. Florida Rock Industries, Inc.,* 710 F.2d 752, 762 (11th Cir.1983). The plaintiff must be the target against which anticompetitive activity is directed. *Midwestern Waffles, Inc. v. Waffle House, Inc.,* 734

F.2d 705, 710 (11th Cir.1984); *Pan-Islamic Trade Corp. v. Exxon Corp.,* 632 F.2d 539, 546–47 (5th Cir.1980), *cert. denied,* 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981). The injury must be "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' act unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). "Incidental or consequential injury or injury remotely caused by an antitrust violation does not give a plaintiff standing to complain that he has been injured by reason of anything forbidden in the antitrust laws." *Midwestern Waffles,* 734 F.2d at 710–11. *See Jeffrey,* 518 F.2d at 1131 (citing cases).

The film production and distribution market was the target of the distributors' alleged anticompetitive behavior in this case. Patterson never intended or prepared to enter this market, whether as a sole proprietor or as a member of a partnership or joint venture. Moreover, there was no evidence that any of the distributors' alleged behavior was directed against him individually. He clearly fell outside the target area.

■ Patterson claimed individual injury in his capacity as an officer and shareholder of SAFFCO, the target of the alleged conspiracy. The law on standing in this situation is clear. Neither an officer nor an employee of a corporation has standing to bring an action in his own right for an antitrust violation causing injury to the corporation and its business. *Midwestern Waffles,* 734 F.2d at 710–11; *Pitchford v. Pepi, Inc.,* 531 F.2d 92, 97–98 (3d Cir. 1975), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976); *Jeffrey,* 518 F.2d at 1131; *Reibert v. Atlantic Richfield Co.,* 471 F.2d 727, 730–31 (10th Cir.1972), *cert. denied,* 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973). Such persons may suffer "indirect" or "secondary" financial injury from antitrust violations, but they are not the target of the anticompetitive practices. *Jeffrey,* 518 F.2d at 1131. Patterson

plainly lacked standing to sue the defendants in this case.

### IV.

■ SAFFCO and Patterson contend that the district court erred in ruling on a variety of motions made during the discovery process. Only two of these claims are worthy of discussion; the remainder are frivolous. A trial judge has broad discretion to control the course of discovery, especially in a complex antitrust case such as this one, and we will not disturb his discovery rulings absent an abuse of discretion. *Commercial Union Insurance Co. v. Westrope,* 730 F.2d 729, 731 (11th Cir.1984); *Majd-Pour v. Georgiana Community Hospital, Inc.,* 724 F.2d 901, 903 (11th Cir.1984); *Aviation Specialties Inc. v. United Technologies Corp.,* 568 F.2d 1186, 1189 (5th Cir.1978).

### A.

On September 10, 1982 SAFFCO's counsel, in Atlanta, received the defendants' notice to take the deposition of a key witness in New York City on September 14, 1982. At the time, counsel for both sides were in the midst of trial in a related case in the district court. Late in the afternoon of the day before the deposition, SAFFCO's attorneys moved the district court for a protective order requiring the defense to reschedule the deposition because they could not be present in New York the next day. Defense counsel had already arrived in New York for the deposition, however. The district court granted SAFFCO's motion on the condition that it pay for one-half of defense counsel's round-trip air fare to New York. Fed.R.Civ.P. 26(c) and 37(a)(4).

■ SAFFCO contends that the order was patently unfair because the notice of deposition was not filed within a "reasonable" time, as required by Fed.R.Civ.P. 30(b), and was not scheduled in good faith. This may be so, but SAFFCO's attorneys could have avoided the situation by advising opposing counsel about their problem before counsel departed for New York. We find no abuse of discretion in the court's award of partial expenses in this situation.

### B.

■ SAFFCO's counsel withdrew three years into the suit. Patterson, SAFFCO's only shareholder, thereafter sought to represent the corporation *pro se* pursuant to 28 U.S.C. § 1654 (1982). The court correctly refused to allow him to do so.

■ Section 1654 provides: "In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein." Patterson failed to recognize that SAFFCO, the corporation, and Patterson, its sole shareholder, were separate legal persons and that section 1654 precluded him from appearing *pro se* in behalf of another person. Moreover, corporations must always be represented by legal counsel. *Southwest Express Co., Inc. v. Interstate Commerce Commission,* 670 F.2d 53, 55 (5th Cir. 1982); *K.M.A., Inc. v. General Motors Acceptance Corporation,* 652 F.2d 398, 399 (5th Cir.1981).

This rule ensures that a licensed attorney, an officer of the court, is responsible for conducting the corporation's litigation. It protects the court and the public from unscrupulous and irresponsible behavior. In this case, for example, Patterson continually made unwarranted personal attacks on the court and opposing counsel, repeatedly misled the court as to the state of the record, and raised frivolous motions and objections. An attorney would have been deterred from engaging in such behavior because of his obligations to the court and his fear of the sanctions that might otherwise be imposed by the court and the bar.

Patterson sought to circumvent the rule which prevents a nonlawyer from representing a corporation by dissolving SAFFCO. To this end, Patterson dissolved SAFFCO in accordance with Georgia law and moved to substitute himself, doing

business as Screen Advertising Film Fund Company, as party plaintiff. As a sole proprietor, he could proceed *pro se* under section 1654.

The trial court denied Patterson's motion. In its dispositive order, the court observed that

> this is a complicated antitrust case; that the appropriate handling of this case demands skilled attorneys, who are officers of this Court; that attempts by Mr. Patterson to act pro se have been and will be disruptive of the orderly processing of this litigation (observe the *ad hominem* approach adopted in the motion to substitute order and the motion for sanctions).
>
> In a courtroom setting should Mr. Patterson be on the witness stand and at the same time attempting to act as his own attorney, the task of the trial judge in preventing the trial from degenerating would be a difficult one.

Patterson takes issue with the court's ruling.

 Georgia law provides that a cause of action on behalf of a corporation, which is the subject of litigation pending on the date of dissolution, may continue to be prosecuted by the corporation in its corporate name. Ga.Code Ann. 14–2–293 (1982). A dissolved corporation may maintain a federal suit when it has been given that power by state law. *Bauer v. Uniroyal Tire Co.*, 630 F.2d 1287, 1290 n. 2 (8th Cir.1980); *Froning's, Inc. v. Johnston Feed Service, Inc.*, 568 F.2d 108, 110 (8th Cir.1978). When Patterson moved to substitute himself for his dissolved corporation, the question became whether the court could insist that SAFFCO continue to prosecute the case.

Fed.R.Civ.P. 25(c) speaks to this question; it governs the substitution of parties during pending litigation due to a transfer of interest through corporate dissolution. *Froning's, Inc. v. Johnston Feed Service, Inc.*, 568 F.2d at 110; *Panther Pumps & Equipment Co. v. Hydrocraft, Inc.*, 566 F.2d 8, 23 (7th Cir.1977), *cert. denied*, 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978). The rule states, in pertinent part,

> (c) **Transfer of Interest.** In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party.

The decision whether to allow substitution is discretionary. *Collateral Control Corp. v. Deal (In re Covington Grain Co.)*, 638 F.2d 1357, 1360 (5th Cir. Unit B 1981); *Prop-Jets, Inc. v. Chandler*, 575 F.2d 1322, 1324 (10th Cir.1978); *Fontana v. United Bonding Insurance Co.*, 468 F.2d 168, 170 (3d Cir.1972). In this case, the district court refused substitution because Patterson's participation had been and would continue to be highly disruptive of the orderly administration of the litigation. We find no abuse of discretion.

### V.

For the reasons we have stated, the district court's summary judgment in favor of the defendants and against SAFFCO is VACATED, and the case is REMANDED for further proceedings on SAFFCO's antitrust claims against the defendants. In all other respects, the district court is AFFIRMED.